**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| **v.** | : | |
| **CORNELIUS STALLWORTH, KHALIL SAEED, GEORGE PINKNEY, and CLARENCE TABBS** | : | **NO. 25-CR-305** |

**MEMORANDUM**

## I. INTRODUCTION

This memorandum accompanies this Court's June 18, 2026 Order (Dkt. 248) denying the Motions to Suppress filed by Cornelius Stallworth, Khalil Saeed, George Pinkney, and Clarence Tabbs (Dkts. 208, 221, 213, 216). By way of background, law enforcement officers executed search warrants at 4224 Ogden Street, 868 Brooklyn Street, and 1935 Brown Street in Philadelphia, Pennsylvania.[1] In their Motions to Suppress, Defendants argued the warrants were not supported by probable cause, and as a result, they sought to suppress all evidence obtained in the searches. Cornelius Stallworth and Khalil Saeed's claims concern the residence at 4224 Ogden Street (Dkts. 208, 221). George Pinkney's motion relates to 868 Brooklyn Street (Dkt.

[1] The Court will refer to these warrants respectively as the Ogden Street Warrant, the Brooklyn Street Warrant, and the Brown Street Warrant.

213), and Clarence Tabbs's motion refers to the 1935 Brown Street residence (Dkt. 216).

At the hearing, the Government rested on the four corners of each of the warrants without presenting additional evidence. Therefore, this Court will only consider the contents of the warrants in its analysis. For purposes of evaluating these motions, the Court accepts the underlying facts of the warrants as true.

## II. BACKGROUND

### A. 4224 Ogden Street

On April 3, 2025, law enforcement officers responded to a shooting at 4500 Lancaster Avenue in Philadelphia, where a man was killed. In video surveillance footage of the incident, homicide detectives observed the shooter being dropped off in the area by a Black Dodge Durango. *See* Ogden Street Warrant, Exhibit A to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-1) at 4. The detectives noted the Durango's last four license plate digits were visible. *Id.* Investigators searched for the vehicle in the license plate recognition (LPR) database in the Tri-State area for the make, model, color, registration state, and partial tag seen in the footage. *Id.* Law enforcement's LPR search yielded results for two vehicles that matched the queried parameters. *Id.* Officers identified a 2024 Dodge Durango bearing a Pennsylvania license plate reading MRT-4970 as registered to an address near the homicide. *Id.* Detectives searched the LPR database, finding that the Durango had been present multiple times in the area of 43rd and Pennsgrove Streets, which is a half mile away from the crime scene. *Id.*

On Wednesday, April 9, 2025, officers searching for additional surveillance footage of the shooting discovered the black Durango, bearing Pennsylvania license plate MRT-4970. The Durango was being driven by a male later identified as Donte Hunter, who is the registered owner of the vehicle. *Id.* Police officers took Donte Hunter into custody for further investigation. The homicide investigators were then notified of an ongoing surveillance operation targeting Donte Hunter as part of a narcotics investigation. Officers from the narcotics investigation provided the homicide detectives with surveillance videos from the 4300 block of Ogden Street. *Id.*

The homicide detectives viewed the footage provided from the narcotics investigation and saw an individual they believed to be Donte Hunter driving the Dodge Durango on April 3, 2025. *Id.* In the footage, at approximately 1:05 p.m., roughly 10 minutes before the shooting, detectives viewed a person matching the shooter's description exiting 4224 Ogden Street and entering the Durango before it drove away. *Id.* at 5. Officers noticed the Durango return to 4224 Ogden Street at approximately 1:24 p.m., minutes after the shooting. *Id.* The footage further showed the suspected shooter exiting the Durango and entering 4224 Ogden Street. Law enforcement asserted that a person believed to be the shooter exited 4224 Ogden Street a short time later wearing different clothes. *Id.*

**B. 868 Brooklyn Street**

In Exhibit D of the Government's omnibus response to Defendants' pretrial motions, the affidavit in support of the applications for search warrants states that investigators believed the residence at 868 Brooklyn Street in Philadelphia was the primary residence of George Pinkney and functioned as a narcotics stash location.

*See* Affidavit in Support of Applications for Search Warrants, Exhibit D to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-4), Ex. D at ¶ 1(d). Officers surveilling the property observed Mr. Pinkney, Mr. Saeed, Mr. Tabbs, and another resident named Tyjae Beverly facilitating the sale of narcotics.

According to the affidavit, on January 27, 2025, Mr. Tabbs agreed to sell approximately 123 grams of cocaine to a confidential human source (CHS1). *Id.* at ¶ 47. Prior to the cocaine sale, officers watched Mr. Tabbs interact with an unknown individual in front of 868 Brooklyn Street. *Id.* at ¶ 50. Eighteen minutes after the interaction in front of 868 Brooklyn Street, officers indicated Mr. Tabbs completed the sale of cocaine to CHS1. *Id.* at ¶ 51.

On February 26, 2025, Mr. Tabbs arranged to sell CHS1 approximately 124 grams of cocaine. *Id.* at ¶ 60. Prior to this cocaine sale, investigators observed Mr. Saeed waiting outside 868 Brooklyn Street and using his cellphone at around 4:25 p.m. *Id.* at ¶ 62. At about 4:30 p.m., investigators witnessed Mr. Pinkney dropping a black plastic bag from the second-floor window of 868 Brooklyn Street. *Id.* Mr. Saeed recovered the black plastic bag and proceeded to 4224 Ogden Street with it. *Id.* Officers watched Mr. Tabbs depart the Ogden Street residence minutes after Mr. Saeed entered with the black plastic bag. *Id. at* ¶ 63. About a half hour later, Mr. Tabbs completed a sale of cocaine to CHS1. *Id.*

On April 23, 2025, law enforcement observed Mr. Tabbs at 868 Brooklyn Street. *Id. at* ¶ 92. Officers saw Mr. Tabbs enter the residence at approximately 4:44 p.m. and exit soon after with a fanny pack secured around his abdomen. *Id.* About

65 minutes later, Mr. Tabbs sold cocaine to CHS1 outside of his 1935 Brown Street address. *Id.* at ¶ 93.

On July 9, 2025, officers observed a dark-colored Range Rover SUV in front of 868 Brooklyn Street. *Id.* at ¶ 114. The officers identified a man named Tyjae Beverly, who exited the residence and approached the SUV with a small object in his left hand. *Id.* Mr. Beverly then made a hand-to-hand transaction with the driver of the SUV. *Id.* Investigators noted that Mr. Beverly reentered 868 Brooklyn Street after the transaction. *Id.*

On July 10, 2025, law enforcement officers watched Mr. Beverly remove a blue shopping bag from a Dodge SUV and bring it into the residence at 868 Brooklyn Street. *Id.* at ¶ 116. Later that night, investigators observed an unknown male arrive in front of 868 Brooklyn Street on a bicycle and make a hand-to-hand transaction with Mr. Pinkney. *Id.* at ¶ 117.

**C. 1935 Brown Street**

Between August 2024 and June 2025, law enforcement investigators claim Mr. Tabbs sold narcotics to a confidential human source on multiple occasions. *See* Affidavit, Exhibit D to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-4) ¶¶ 7, 11, 20, 38, 47, 60, 67, 72, 87, 102, 109. The investigators assert that Mr. Tabbs sold cocaine on seven separate occasions, methamphetamine on four separate occasions, and mixtures containing fentanyl on two separate occasions. *Id.* Mr. Tabbs's cocaine sales occurred on December 9, 2024, and in 2025 on January 8, January 27, February 26, April 23, May 29, and June 5. *Id.* at ¶¶ 20, 38, 47, 60, 87, 102, 109. The individual

quantities of cocaine sold by Mr. Tabbs ranged from 60 to 252 grams of cocaine or "a white powdery substance that field tested positive for cocaine." *Id.*

Law enforcement claims to have conducted controlled purchases of methamphetamine from Mr. Tabbs on August 21 and September 16, 2024, and on March 11 and April 1, 2025. *See id.* at ¶¶ 7, 11, 67, 72. The individual quantities of methamphetamine sold by Mr. Tabbs ranged from 446 to 2,227 grams. *Id.* Investigators allege that in addition to the sales of methamphetamine, Mr. Tabbs also sold a mixture containing fentanyl on March 11 and April 1, 2025. *Id.* at ¶¶ 67, 72. The quantities of the alleged fentanyl mixture sold were 20 and 49 grams, respectively. *Id.*

During the investigation, law enforcement officers observed Mr. Tabbs selling narcotics from his residence at 1935 Brown Street in Philadelphia, Pennsylvania. *Id.* at ¶¶ 71, 93, 113. On March 11, 2025, investigators contend Mr. Tabbs exited his residence at 1935 Brown Street with a grey grocery bag containing narcotics and entered CHS1's vehicle, completing a sale of methamphetamine and a mixture containing fentanyl once inside. *Id.* at ¶ 71. Mr. Tabbs exited his residence at 1935 Brown Street with narcotics in hand and completed a sale of cocaine to CHS1 on April 23, 2025. *Id.* at ¶ 93. On June 5, 2025, Mr. Tabbs sold a white powdery substance to CHS1 and immediately entered his residence at 1935 Brown Street. *Id.* at ¶ 113. Lastly, on July 11, 2025, Mr. Tabbs communicated to CHS1 that he intended to continue selling narcotics from his residence at 1935 Brown Street. *Id.* at ¶ 122.

## III. DISCUSSION

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Thus, to survive scrutiny under the Fourth Amendment, the warrants at issue must be supported by probable cause. The Supreme Court defined probable cause in *Illinois v. Gates* as "a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. 213, 238 (1983). Furthermore, the Supreme Court has explained that probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. Probable cause is assessed using a totality-of-the-circumstances analysis. *Id.* at 238. The affiant must provide sufficient information to the magistrate, and the magistrate's "action cannot be a mere ratification of the bare conclusions of others." *Id.* at 239.

Courts must also consider particularity. For a warrant to satisfy particularity, it must identify the specific offense, describe the place to be searched, and specify the items to be seized in relation to the designated crimes. *United States v. Perez,* 712 Fed. App'x 136, 139 (3d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013)).

In *United States v. Stearn*, 597 F.3d 540 (3d Cir. 2010), the Third Circuit held a magistrate judge may determine probable cause based on the crime, items sought, and inferences about where evidence might be hidden. *Id.* at 554 (citing *United States v. Jones*, 994 F.2d 1051 (3d Cir. 1993)). The Court recognized that in some

circumstances suspected drug dealers will be inclined to use their homes to hide and store evidence associated with drug dealing. *Id.* at 559. A non-exhaustive list of factors to establish the nexus between defendants' drug dealing activities and their homes includes "large-scale operations, … the conclusions of experienced officers regarding where evidence of a crime is likely to be found, [and] the proximity of the defendant's residence to the location of criminal activity[.]" *Id.* at 559–60. The Third Circuit determined that even if other locations are more likely to contain evidence of the underlying crime, "a magistrate may infer probable cause to search the drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *Id.* at 560.

Regarding probable cause for the Ogden Street Warrant, there was a fair probability that evidence of the shooting would be found at 4224 Ogden Street. In the warrant, the affiant stated that a person matching the description of the shooter was seen departing 4224 Ogden Street immediately before the shooting. *See* Ogden Street Warrant, Exhibit A to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-1) at 4. The affiant described someone matching the description of the shooter returning to the residence immediately after the shooting. *Id.* The nexus between 4224 Ogden Street and the shooting is firmly established even without the identification of the shooter as any particular individual.

Mr. Stallworth alleges that there are misstatements and omissions in the probable cause affidavit. Mr. Stallworth specifically challenges the truthfulness of the statements identifying him as the shooter. *See* Motion to Suppress (Dkt. 208) at 5–6. Mr. Stallworth's contentions fall short of rendering the warrant deficient.

Mr. Stallworth's second contention is that the affidavit omits the fact that the surveillance footage used is not continuous and has gaps in time. *See id.* at 5. This Court observes that probable cause can be established without uninterrupted surveillance footage. The noncontinuous footage, for the reasons discussed above, still created a fair probability that evidence of the homicide might have been found at 4224 Ogden Street.

Mr. Saeed claims the warrant to search 4224 Ogden Street fails to satisfy the framework set forth by the Third Circuit in *United States v. Burton*, 288 F.3d 91 (3d Cir. 2002). *See* Mot. to Suppress (Dkt. 221) at 3–5. *Burton* explains that probable cause to search a residence associated with drug distribution requires evidence "(1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *Burton*, 288 F.3d at 104. Yet the standard articulated in *Burton* specifically applies when the underlying offense is drug related. *Id.* Mr. Saeed's argument fails because the Ogden Street Warrant was based on a homicide, not a drug offense.[2]

Mr. Saeed's second contention is that the Ogden Street Warrant lacked the particularity required by the Fourth Amendment. *See* Mot. to Suppress (Dkt. 221)

---

[2] While searching for evidence of a homicide pursuant to the Ogden Street Warrant, the police saw evidence of drug dealing in plain view. The plain view doctrine allows officers to seize incriminating evidence if they are lawfully present in the location from which the evidence is visible, the incriminating character of the evidence is immediately apparent, and the officers have a lawful right of access to the evidence. *United States v. Dyer*, 54 F.4th 155, 158 (3d Cir. 2022). Despite this, after observing the evidence of narcotics sales in plain view, the police obtained a second search warrant for 4224 Ogden Street, authorizing a search for narcotics and other evidence associated with drug distribution. *See* Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-1), Ex. B. None of the defendants challenged this warrant.

5–6. However, the Ogden Street Warrant explicitly gives the location to be searched and lists the items to be seized. The Warrant specifies the goal is "to conduct a search of the residence that was used by the offenders on the day of the homicide, to recover any and all firearms, black hooded sweatshirt, black jacket, black sweatpants with reflective patch on left leg, white/gray sneakers, all latent print and DNA evidence, all cell phones, computers, tablets, and other digital evidence including video DVR systems and other video recording devices in order to identify communications between conspirators and their movements the day of the murder." Ogden Street Warrant, Exhibit A to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-1) at 4. The Ogden Street Warrant therefore described with sufficient particularity the place to be searched and the items to be seized.

With regard to 868 Brooklyn Street, Mr. Pinkney claims that there was not a sufficient nexus between him, the alleged drug trafficking conspiracy, and his residence at 868 Brooklyn Street. *See* Mot. to Suppress (Dkt. 213). Mr. Pinkney asserts probable cause was not established to search 868 Brooklyn Street because "any connection between him and the alleged conspiracy is a result of speculation, loose affiliation with some of the other actors, and wild imagination." *See id.* at 7. Mr. Pinkney similarly raises the *Burton* standard and claims it cannot be met in the present case. *Id*. at 14.

As described above, law enforcement monitored the residence at 868 Brooklyn Street and concluded it was likely to contain evidence of the sale of narcotics. The events on February 26, 2025, established a fair probability that evidence of narcotics sales could be found at 868 Brooklyn Street. *See* Affidavit, Exhibit D to Gov't

Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-4) at ¶¶ 60–63 (a black plastic bag was transferred from 868 Brooklyn Street to 4224 Ogden Street preceding a cocaine sale). On April 23, 2025, law enforcement claims Mr. Tabbs exited 868 Brooklyn Street wearing a fanny pack prior to another narcotics sale. *Id.* at ¶¶ 87–93. Furthermore, on July 10, 2025, investigators allege Mr. Pinkney conducted a hand-to-hand transaction directly in front of 868 Brooklyn Street and returned inside immediately after. *Id.* at ¶ 117.

The events described above create a sufficient nexus between 868 Brooklyn Street and the narcotics trafficking conspiracy for purposes of probable cause. Law enforcement officers determined that evidence might be found at 868 Brooklyn Street, and the residence was in close proximity to an alleged narcotics conspiracy of considerable size.

Mr. Tabbs contends that the affidavit of probable cause is insufficient for 1935 Brown Street. *See* Mot. to Suppress (Dkt. 216). He claims that evidence of illegal activity elsewhere does not create a sufficient nexus to his residence. Mr. Tabbs asserts that he was surveilled traveling elsewhere before conducting any alleged criminal activity and therefore argues probable cause does not exist for 1935 Brown Street. *Id.*

At 1935 Brown Street, as described above, investigators claim Mr. Tabbs made multiple narcotics sales. *See* Affidavit, Exhibit D to Gov't Omnibus Resp. to Def.'s Pretrial Motions (Dkt. 226-4) at ¶¶ 71, 93. On March 11 and April 23, 2025, Mr. Tabbs exited his residence at 1935 Brown Street and immediately sold narcotics. *Id.* Officers also claim Mr. Tabbs communicated to CHS1 that he intended to continue

selling narcotics from his home at 1935 Brown Street on July 11, 2025. *Id.* at ¶ 122. During their investigation, law enforcement officers reported that Mr. Tabbs made numerous other narcotics sales throughout the local area. Under the totality of the circumstances, Mr. Tabbs's purported use of 1935 Brown Street to sell narcotics created a fair probability that evidence of controlled substances and drug trafficking would be found at the residence. Mr. Tabbs's alleged use of his residence and his proximity to the purported narcotics trafficking conspiracy also creates a sufficient nexus for the purposes of probable cause.

**Good Faith Exception**

Even if probable cause were lacking for any of the warrants, the good faith exception would preclude suppression here. The "'good faith' exception to the exclusionary rule [ ] prohibits suppression of 'evidence obtained in objectively reasonable reliance' on a warrant later invalidated for lack of probable cause." *United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The Third Circuit has identified four situations where the good faith exception does not apply:

> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* at 170 (citations omitted).

In the present case, there is no indication that the magistrate judge abandoned the neutral and detached judicial role. As discussed above, the record does not establish that the affidavits were deliberately or recklessly false. There are no claims that the search warrants were merely rubber-stamped for law enforcement. The search warrants satisfied the standard for probable cause and stated with particularity the locations to be searched and the items to be seized. In sum, the law enforcement officers who executed the search warrants had no basis to doubt the validity of the warrants and executed them in good faith.

## IV. CONCLUSION

There was sufficient probable cause for the Ogden Street Warrant, the Brooklyn Street Warrant, and the Brown Street Warrant. Further, even if the warrants were deficient, the good faith exception would still prevent suppression of the evidence. Suppression of evidence obtained at 4224 Ogden Street, 868 Brooklyn Street, and 1935 Brown Street is unmerited.

DATED: September 23, 2026

BY THE COURT:

GAIL WEILHEIMER J.